<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>KENDALE WILSON and ALTON DURHAM,<br><br>  Defendants. | Case No. 2:25-cr-00039 (BRM)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant Alton Durham's ("Durham") Motion to Suppress Evidence. (Durham's Omnibus Discovery Mot. (ECF No. 34) at 2.) Durham is being prosecuted alongside co-defendant Kendale Wilson ("Wilson") (collectively, "Defendants"). (*See* Complaint (ECF No. 1).) Wilson has not requested any evidence to be suppressed. (*See generally* Wilson's Omnibus Discovery Mot. (ECF No. 33).) Durham initially raised this Motion to the Court as part of his Omnibus Discovery Motion. (ECF No. 34 at 2.) The Government briefed its opposition to the Motion in its letter opposing both Defendants' Omnibus Discovery Motions. (ECF No. 35 at 6.) Durham replied in his Omnibus Discovery Reply Brief. (ECF No. 36.) On October 15, 2025, the Court held a hearing to consider the arguments and evidence specifically pertaining to the issue of suppression. (Tr. of Suppression Hearing (ECF No. 46).) At the end of the hearing, the Court granted both sides leave to file a single, supplemental brief to address the suppression issue specifically. (*Id.* at 197:22–198:24.) On December 5, 2025, each party supplied the Court with a supplemental brief. (Durham's Suppl. Br. In Supp. of Mot. to Suppress (ECF No. 48); Gov't Suppl. Br. in Opp'n to Mot. to Suppress (ECF No. 49).)

Having reviewed and considered the parties' submissions filed in connection with the Motion and having heard oral argument for this issue on October 15, 2025, for the reasons set forth below and for good cause appearing, Durham's Motion to Suppress (ECF No. 34) is **DENIED**.

## I.    BACKGROUND

### A.    Factual Background

On April 6, 2024, an anti-crime task force consisting of the New Jersey State Police ("NJSP"), agents from the Division of Criminal Justice ("DCJ"), another state law-enforcement agency, and the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") conducted a surveillance operation within "high-crime" areas of New Jersey. (ECF No. 33 at 2; ECF No. 34 at 1; ECF No. 35 at 2.) The task force was organized into a convoy of approximately twenty officers across ten to twelve police vehicles. (ECF No. 46 at 16:13–20.) The officers were uniformed with tactical vests identifying the officers as law enforcement and bearing the insignia of their respective organizations, but the vehicles themselves were unmarked. (*Id.* at 16:5–15.)

The convoy patrolled the city in a unit, moving around the city while monitoring the streets for indicia of criminal activity—particularly drug or gun crime. (*Id.* at 16:21–17:10.) The task force works in conjunction with the Real-Time Crime Center (the "Crime Center"), which provides them with a map displaying the hotspots in the operational area with an elevated number of "violent crimes [including] guns, drugs, [and] robberies." (*Id.* at 122:21–123:7.) The map provided to the officers did not highlight the area in which Defendants Durham and Wilson had congregated as a criminal hotspot but did flag that gun recoveries had occurred at the location. (*Id.* at 89:17–23.) The Crime Center also provided the officers photos of individuals with outstanding warrants, which did not include either of the defendants. (*Id.*) The detectives who testified at the suppression

hearing, Detectives Juan Molina, Samuel Lauture, and Luis Quispe, were each positioned near the front of the convoy. (*Id.* at 17:8–22.)

The convoy operated by splitting into different squads before patrolling the city of Paterson. (*Id.* at 122:21–123:8.) The vehicles in the convoy were unmarked, and the officers inside were dressed in plain clothes with police identifiers. (*Id.* at 125:5–9.) These squads were in persistent contact via radio and shared details on potential crimes each surveillance unit observed. (*Id.* at 16:21–17:4.) While the convoy was focused on high-crime areas, they did travel through and report on other areas within Paterson. (*Id.* at 89:9–23.) The breadth of the surveillance activity was driven by both the convoy's need to navigate these areas to surveil hotspots identified by the Crime Center and because of the detectives' own professional experience regarding high-crime areas in Paterson. (*Id.* at 122:21–124:3.)

That night, Defendants Durham and Wilson were standing outside El Fogón Restaurant, Bar, and Liquor ("El Fogón") in Paterson, New Jersey. (ECF No. 33 at 3; ECF No. 34 at 1; ECF No. 35 at 3.)[1] At the end of their surveillance patrol, the convoy of officers were traveling down Union Avenue, which led them to the front of El Fogón. (ECF No. 46 at 19:3–15.) Although El Fogón provides several products, the officers involved with Defendants' arrest knew of it primarily as a liquor store. (*Id.* at 19:3–5, 86:1–12, 192:20–25.) As they approached the liquor store around 11:00 p.m., the officers saw a group of men standing outside wearing dark clothing; two of these men were Defendants Wilson and Durham (*Id.* at 125:17–126:2 (placing the time the officers first approached El Fogón at "10:37 p.m."), 132:10–20 (identifying the defendants).)

---

[1] Wilson and Durham were accompanied by an additional individual, Myron Menchan, who was also arrested but is not a defendant in this matter. (ECF No. 34 at 1.)

Without leaving their vehicles, the officers engaged Defendants in a conversation, the tenor of which the parties dispute. (*Id.* at 104:16–105:3.) According to the Government and the officers, the officers called out from their car with a conversational tone and proceeded to have a short 15- to 30-second conversation with Defendants. (*Id.* at 136:7–137:24.) Detective Molina testified that engaging the public in a "casual conversation" is a standard practice for plain clothes officers, because it allowed them to "gauge the reaction of the public to [the] presence [of police] in these high-crime areas." (*Id.* at 22:1–23:19.) Individuals who may be engaged in criminal activity were more likely to "give[] . . . some sort of indicator," such as "blad[ing] their body or grab[bing] their waistband" in an effort to conceal something from the plainclothes officers. (*Id.* at 23:12–19.)

Defendants provide a different account of this conversation. According to Durham, no casual conversation occurred; instead, immediately after driving up to the group, the officers "ordered [them] . . . not to move," shined their flashlights into the eyes of the group, and "barked commands . . . in an aggressive manner." (Durham Cert. (ECF No. 34-2) ¶ 2.)

However, in either version, while speaking with the group, the officers noticed Wilson "blading" his body, *i.e.*, positioning himself so the officers could not get a good view of one side of his body. (ECF No. 46 at 77:20–78:5.) Although the other members of the group spoke to the officers, Wilson did not engage and instead began to walk backwards into the alley beside El Fogón. (*Id.* at 78:6–10.) According to the officers, Durham moved in front of Wilson to conceal his retreat into the alley. (*Id.* at 30:7–25.) Detectives Lauture and Molina used their flashlights to observe Wilson's waistband, where they saw him clutching an object under his clothing. (*Id.* at 135:5–24.) Seeing Wilson clutching an object under his clothes and taking steps to conceal himself from the officers, the officers decided that they would need to stop Wilson and search him, so they exited their vehicles and began to approach Wilson. (*Id.* at 30:18–31:18.)

4

Seeing the officers approach him, Wilson began to flee, turning and sprinting down the alleyway. (*Id.* at 31:11–16.) Detectives Lauture and Molina chased Wilson down into the alley, and during the chase they observed Wilson grasp at his "upper torso" before discarding a handgun and running in the opposite direction. (*Id.* at 32:18–33:12.) Seeing Wilson being pursued by the detectives, Durham, who had initially engaged with the officers himself, began to flee in a different direction, across the street toward the rest of the officers. (Gov't Ex. 2 at 5:00–5:50.) Durham was swiftly stopped by the detail of officers—one officer tripped Durham to prevent his flight, and a loosely secured handgun was flung from Durham's waistband as he fell to the ground. (Gov't Ex. 4 at 0:30–1:30.)

The Office of the Attorney General of the State of New Jersey has instructed law enforcement on when and how they are supposed to employ their body worn cameras ("BWCs") and has published those requirements (the "BWC Policy"). (ECF No. 48 at 240.) This document instructs that officers "equipped with a BWC" are "required to activate the device . . . at the initiation of any law enforcement or investigative activity." (*Id.* at 253.) Despite this policy, the officers did not immediately activate their body worn cameras. (*See* ECF No. 46 at 22:7–15.) Detective Lauture activated his camera shortly after engaging Defendants in conversation, but the details of the exchanges were not audible from the recording. (Gov't Ex. No. 5 at 0:00–0:30.) Other officers activated their cameras shortly before, or during, the ensuing chase. (ECF No. 46 at 30:18–31:18.)

### B. Procedural History

This case was brought on June 17, 2024, with a criminal complaint against both Wilson and Durham alleging Possession of a Machine Gun and Possession of Ammunition by a Convicted Felon against Wilson, alongside Possession of a Machine Gun and Possession of a Firearm by a

Convicted Felon against Durham. (Compl. (ECF No. 1) at 2–5.) Shortly thereafter, on August 22, 2024, the Court issued an order advising the Government of its ongoing obligation to turn over all exculpatory evidence to Defendants. (ECF No. 8.) The same day, the Court appointed attorneys for both Defendants; John McMahon was appointed as Counsel for Wilson (ECF No. 9) and Charles B. McKenna was appointed as Counsel for Durham (ECF No. 13).

On January 17, 2025, Defendants were indicted on all the charges listed in the Complaint. (ECF No. 22.) On April 11, 2025, Defendants submitted their Omnibus Motions contesting all discovery issues between Defendants and the Government. (ECF No. 33; ECF No. 34.) Durham's Motion also argued firearms recovered by the detectives must be suppressed pursuant to Defendants' Fourth Amendment rights. (ECF No. 34 at 2–3.) The Government filed an opposition on May 9, 2025, arguing it had satisfied its ongoing discovery obligations and would continue to do so and that maintaining suppression of the firearm evidence was not warranted. (ECF No. 35 at 6–8, 13–16.) Durham filed a Reply on May 9, 2025, arguing suppression of the firearm evidence was warranted because Defendants had been seized and submitted to the authority of the detectives at the outset of their encounter. (ECF No. 36.) On July 11, 2025, based on the Court's understanding that the Government had fully complied with its discovery obligations and would continue to do so, the Court issued an Order Denying Without Prejudice all of Defendants' discovery motions, save for Durham's Motion to Suppress. (ECF No. 39.) As to the suppression issue, the Court scheduled a suppression hearing. (*Id.*)

The Court held a suppression hearing on October 15, 2025, where the Court had the opportunity to consider the parties' arguments regarding suppression along with the credibility of the detective's testimony involved with the arrest and discovery of the evidence. (ECF No. 45.) At the end of the hearing, the Court provided the parties with an opportunity to file additional briefing

regarding the suppression issue (ECF No. 46 at 197:22–198:24), which they submitted on December 5, 2025. (ECF No. 48.)

## II.   LEGAL STANDARD

Federal Rule of Criminal Procedure ("Rule") 41(h) provides "[a] defendant may move to suppress evidence in the court where trial will occur, as Rule 12 provides." Fed. R. Crim. P. 41(h). Rule 12 requires suppression motions be made prior to trial. Fed. R. Crim. P. 12 (b)(3)(C).

The Supreme Court "created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231 (2011). "The Fourth Amendment forbids 'unreasonable searches and seizures,' and this usually requires the police to have probable cause or a warrant before making an arrest." *Herring v. United States*, 555 U.S. 135, 136 (2009). However, a traffic stop of a vehicle requires only reasonable suspicion of criminal activity, rather than probable cause. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (citing *Terry v. Ohio*, 392 U.S. 1, 29 (1968)). A policeman who lacks probable cause, "but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Id.* The test for reasonable suspicion is an objective one—"as a general matter, the decision to stop an automobile is reasonable where . . . a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (explaining police officers may perform investigatory traffic stops based on reasonable suspicion that an individual has violated a traffic law). Where a stop is not supported by reasonable suspicion, any evidence obtained as a result must be suppressed, absent some other exception. *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

Unless the investigation provides the officer with probable cause for further search of the detainee's person or vehicle, or probable cause for arrest, the detainee must be released. *Berkemer*, 468 U.S. at 439–40. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The "automobile exception" to the warrant requirement of the Fourth Amendment "permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Donahue*, 764 F.3d 293, 299–300 (3d Cir. 2014); *see also United States v. Matthews*, 597 F. Supp. 3d 694, 703 (D.N.J. 2022) ("Where an officer has probable cause to believe an automobile contains evidence of an offence, the so-called 'automobile exception' permits a warrantless search of the vehicle."). "The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'" *United States v. Lackey*, No. 20-2977, No. 20-2978, 2022 WL 313807, at *2 (3d Cir. Feb. 2, 2022) (quoting *Donahue*, 764 F.3d at 301).

Generally, "[t]he proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated." *United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)). However, "[i]n the case of a warrantless search, the government bears the burden to show that the search or seizure was reasonable." *United States v. Howard*, 787 F. Supp. 2d 330, 331 (D.N.J. 2011) (citing *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995)).

When acting as the finder of fact, the Court deploys its sound judgment to determine the credibility of witness testimony. The Court considers a number of factors, including:

> (1) The opportunity and ability of the witness to see or hear or know the things about which the witness testified; (2) The quality of the witness' knowledge, understanding, and memory; (3) The witness' appearance, behavior, and manner while testifying; (4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; (5) Any relation the witness may have with a party in the case and any effect the verdict may have on the witness; (6) Whether the witness said or wrote anything before trial that was different from the witness' testimony in court; (7) Whether the witness' testimony was consistent or inconsistent with other evidence that you believe; and (8) Any other factors that bear on whether the witness should be believed.

*United States v. Outlaw*, No. 2:21-CR-00382 (BRM), 2024 WL 5704408, at *9 n.14 (D.N.J. May 14, 2024), *aff'd*, 138 F.4th 725 (3d Cir. 2025) (quoting Model Criminal Jury Instructions § 3.04).

## III.   DECISION

### A.   Durham's Fourth Amendment Rights Were Not Violated.

Durham's motion to suppress relies on two fundamental elements, both of which must be true to justify suppression: (1) that Durham was seized within the meaning of the Fourth Amendment, and (2) that law enforcement did not have "reasonable suspicion on the basis of articulable facts" at the time he was seized. *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002). It is the Court's job to determine at which point each defendant was seized before determining whether the Government has met its burden in showing the officers had reasonable suspicion to justify the stops.

A suspect "has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Chruby v. Gillis*, 54 F. App'x 520, 524 (3d Cir. 2002) (same). The Supreme Court is clear that while circumstances like the "threatening presence of several officers, the display of a weapon by an

9

officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled," might indicate a seizure, mere "inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555. However, a seizure is not effectuated until the person in question submits to a show of police authority or is brought under their physical control. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000). Stated simply if "the suspect does not submit, there is no seizure." *Id.*; *see also Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989) (holding that despite a 20-mile car chase, a suspect was only seized after he was brought under the officers' "physical control" by colliding with a police roadblock).

For a seizure to be justified under the Fourth Amendment, the law enforcement personnel involved in the seizure must provide different levels of evidence, depending on the invasiveness and duration of the seizure. Any substantial seizure such as an "arrest or post-arrest detention" are reasonable "'only if based on probable cause to believe that the individual has committed a crime.'" *Kendig v. Stolar*, 173 F.4th 466, 472 (3d Cir. 2026) (quoting *Bailey v. United States*, 568 U.S. 186, 192 (2013)). However, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). These stops are commonly called "*Terry* stops," after the case which held such stops are compatible with the Fourth Amendment, *Terry v. Ohio,* so long as the investigative stop was justified by "specific and articulable facts which . . . reasonably warrant that intrusion." 392 U.S. 1 (1968). This requirement for "reasonable suspicion is a generally undemanding standard," but it does require more than a mere hunch; instead, "a police officer does

have the initial burden of providing the specific, articulable facts," which justify the officer's belief that the suspect was violating the law. *Delfin-Colina*, 464 F.3d at 397.

Regardless of the type of seizure, where that seizure was not justified, "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in a federal court." *Mapp v. Ohio*, 367 U.S. 643, 654 (1961). Although typically the "exclusionary rule requires that [the court] suppress evidence obtained as a result of an illegal search," there are a handful of exceptions whereby the Government may still rely on such evidence. *United States v. Stabile*, 633 F.3d 219, 243 (3d Cir. 2011). The "independent source doctrine" permits the Government to use "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Id.* (quoting *United States v. Price,* 558 F.3d 270, 281 (3d Cir. 2009)). Similarly, if the evidence obtained as a consequence of an illegal search "ultimately or inevitably would have been discovered by lawful means then . . . the evidence should be received." *Id.* at 245 (quoting *United States v. Vasquez De Reyes,* 149 F.3d 192, 195 (3d Cir. 1998)). Finally, evidence is admissible under "the attenuation doctrine . . . when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Utah v. Strieff*, 579 U.S. 232, 238 (2016).

There are three moments when the parties plausibly contend a seizure occurred. First, when the police first approached Defendants and began asking them questions. (ECF No. 48 at 8.) Second, when the officers displayed their authority by exiting their vehicle and attempting to prevent Defendants from leaving. (ECF No. 46 at 22:1–10.) Finally, the moments when the officers used physical force to prevent Defendants from leaving. (ECF No. 49 at 7.) The Court finds that Durham was not seized until an officer tripped him, using physical force to prevent Durham's escape for the reasons set forth below.

11

**1.    The officers' innocuous initial contact with Defendants did not amount to a seizure.**

Durham contends he was seized at the very instant the officers drove up to the group of men and began asking them questions. (ECF No. 48 at 8.) According to Durham, the combination of "enormous police presence, the shining of the flashlight, and the questioning by the officers, undoubtedly" would have signaled to a reasonable individual "they were not free to leave." (*Id.* at 13.) The Court disagrees. Although the Court considers Durham's claims that the police immediately "barked commands" and blinded the group with "flashlights [pointed] into our faces," these allegations contradict the weight of the credible evidence before the Court. (ECF No. 34-2 ¶ 2.) Detectives Lauture and Molina offered consistent and believable testimony that they neither barked commands, nor shined the flashlight in either man's face. (ECF No. 46 at 24:1–8, 25:18–26:1, 136:7–137:22.) Instead, according to Detective Lauture, he called out to Defendants and "asked them how they were doing" and asked what "they [were] doing on that corner." (*Id.* at 137:16–20.) The detectives also testified that Detective Lauture used his flashlight to light up the ground before moving the beam of the flashlight up to Wilson's waist and retreated the beam shortly thereafter—at no time did the detectives deliberately shine their flashlight into the faces of Defendants. (*Id.* at 137:5–10.) All the detectives to testify offered credible testimony, consistent across direct and cross examination as well as consistent with the testimony of other detectives. (ECF No. 46 at 24:1–8, 25:18–26:1, 136:7–137:22, 181:2–182:20.)

Three law enforcement officers, Detectives Molina, Lauture, and Quispe provided testimony regarding the stop. (*See generally* ECF No. 46.) In considering their testimony, the Court found no indicia in the tone, body language, or substance of their testimony to believe the Detectives were being anything but forthright and truthful in their representations before the Court.

(*Id.*) Each officer provided answers which were consistent with their other testimony, the testimony of the other detectives, and the other evidence before the Court. (*Id.*) In favor of the defense, Durham submitted an affidavit to the Court. (ECF No. 34-2.) The affidavit contains representations both as to the conduct and the detectives and to his own perceptions at the time. (*Id.*) Durham's statements are also broadly consistent with the other evidence available to the court. (*Id.*) However, because he did not testify, the Court was unable to examine his behavior, or how his testimony would fare if subject to the rigors of cross-examination. (*See generally* ECF No. 46.) The Court must also consider the clear interest Durham has in ensuring evidence against him is suppressed when considering the value of his affidavit as evidence. *See Outlaw*, 2024 WL 5704408, at *9 n.14. For each of these reasons, the Court will credit all of the testimony before it as credible evidence while giving greater weight to the in-court testimony of the detectives.

The physical evidence both parties presented to the Court further confirms the credibility of the detectives' testimony. For example, Detective Lauture's BWC was not active to capture the entirety of his initial conversation with Defendants. (Gov't Ex. No. 5 at 0:00–0:30.) However, Detective Lauture's conduct at the beginning of the recording supports the credibility of his testimony, as it demonstrates he was sitting in a relaxed position and speaking calmly when he retrieved his flashlight. (*Id.*) This is contrary to Durham's affidavit, which claims the detectives immediately and simultaneously gave commands and used their flashlight upon arriving at El Fogón. (ECF No. 34-2 ¶ 2.) The video from the camera pole further supports the detectives' testimony. It shows that over the course of a minute after the police arrived, they engaged Defendants in a casual conversation, and only then did the detectives use their flashlights, which they kept focused close to the ground—not the faces of the Defendants. (Gov't Ex. No. 2 at 5:00–6:30.)

13

Durham stresses Detective Lauture spoke with an elevated voice when engaging Defendants in a casual conversation from several feet away. (ECF No. 48 at 2–3 (arguing Durham was seized because officers "had to raise their voices to be heard").) However, there is a large gap between needing to raise one's voice to be heard at a distance and "shouting" or "barking orders," as Durham's certification claims. (ECF No. 34-2 ¶ 2.) Defendants' position poses a false choice, either police use their indoor voice at all times—even if that would render them inaudible—or else risk inadvertently seizing anyone they speak to. Here, though the precise tone is unknown, the content of Detective Lauture's discussion is unrebutted: he asked the group of men how their night was going and what they were doing out on the corner. (ECF No. 46 at 137:16–24.) This is the precise type of "inoffensive contact between a member of the public and the police" which the Supreme Court has held "cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555 (holding that merely approaching and asking questions of potential suspects does not implicate the Fourth Amendment).

Durham also objects to Detective Molina's admission he lacked any personal knowledge of Defendants at the time he and Detective Lauture decided to engage them in conversation. (ECF No. 48 at 7.) More specifically, when Durham's attorney cross-examined Detective Molina, the attorney asked a series of questions about whether the detectives possessed any personal knowledge of Defendants before talking with them. (ECF No. 46 at 83:24–85:4.) Detective Molina truthfully answered he only knew of what could be visually ascertained: that Defendants were black, male, wearing black hoodies, congregating around a liquor store near midnight with a group of other men, and that they appeared to be attempting to shield one of their members from the view law enforcement. (*Id.* at 82:4–85:4.) To the degree Durham argues this is insufficient knowledge to justify the initial decision to question, no such justification is necessary. (ECF No. 48 at 7.) It is

14

well-settled that the detectives asking Defendants how their night was going is the kind of innocuous contact between law enforcement and the public that does not implicate any Fourth Amendment protection. *Mendenhall*, 446 U.S. at 555.

However, just because no justification is required, that does not mean the government is free to act on invidious motives, namely racial discrimination. *See, e.g.*, *Batson v. Kentucky*, 476 U.S. 79, 84–86 (1986) (holding although the prosecution was "entitled to use [its] peremptory challenges to strike anybody [it] want[s] to" without specific justification it may not use that to engage in "[p]urposeful racial discrimination"). To the degree Defendants argue the police acted on such purposeful discrimination, this argument fails for two reasons: first, the officer's subjective reasons to initiate inoffensive or consensual contact are irrelevant to whether there has been a seizure for the purposes of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996). Second, the record simply does not support the inference that Detectives Molina and Lauture were being purposefully discriminatory when approaching Defendants. (ECF No. 34-1 at 10 (arguing "racial profiling . . . is antithetical to the constitution").)

Although "the Constitution prohibits selective enforcement of the law based on considerations such as race," the suppression of evidence is a Fourth Amendment remedy, and "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary . . . Fourth Amendment analysis." *Whren*, 517 U.S. at 813. Furthermore, even if the Fourth Amendment contemplates the suppression of evidence due to the discriminatory intent of the officers, the detectives' testimony does not support finding any such intent. (*See generally* ECF No. 46.) Defendants ask the Court to focus on the portion of testimony from Detective Molina where he stated the only thing he knew about Defendants at the time Detective Lauture decided to

15

talk with Defendants was that they were "black" and "male." (*Id.* at 84:19–25.) However, it is clear

from the context Detective Molina was only testifying that he lacked any "hard information" about

Defendants, not as to his or Detective Lauture's motive for talking to Defendants. (*Id.* at 83:24–

84:25 (testifying he did not know whether Defendants had outstanding warrants, their names, or

any specific personal information). For example, both Detectives testified they could observe

several suspicious behaviors on the part of the group which provided reason for approaching them,

independent of any alleged discriminatory motive. (*Id.* at 83:24–85:4, 136:7–144:2 (testifying they

observed a group of men wearing all black outside a liquor store near midnight, and these men

acted together to obscure the detectives' view of Wilson and the gun he was carrying).) Therefore,

the Court disagrees with Defendants' position that they were seized from the moment the police

arrived at El Fogón and finds there is no basis for believing this contact was initiated due to

purposeful discrimination.

### 2. Defendants were not seized at the officer's display of authority because they refused to submit to said authority.

The next possible moment where the police could have affected a seizure is when

Detectives Lauture and Molina exited their vehicles and began to approach Defendants. The

detectives themselves testified this was the point where they understood themselves to be required

to activate their BWCs, because at that point a suspect "was not free to leave." (*Id*. at 22:7–15.)[2]

However, as the Government correctly points out, there are two conditions where law enforcement

is considered to have seized a citizen: (1) when they employ physical force to restrain the citizen,

---

[2] Whether a suspect would feel free to leave is an objective test, based on when a reasonable person would believe that they were no longer free to leave. *Shuman ex rel. Shertzer*, 422 F.3d at 147 ("A seizure occurs for Fourth Amendment purposes when a reasonable person would have believed that he was not free to leave.").

16

or (2), in the absence of force where there is "submission to [an officer's] assertion of authority," by the citizen. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). The citizen's submission is the critical element; if "the subject does not yield," then there has been no seizure. *Id.*

Here, neither Defendant submitted to the officer's authority. Wilson, who had already been concealing himself and retreating into a nearby alley, had broken into a full sprint away from the detectives either directly before or after they exited their vehicle. (Gov't Ex. 3 0:30–1:30; *see also* ECF No. 46 at 32:9–33:14.) For Durham's part, while he did not flee at the same time as Wilson, it is clear he did not submit either. (*Id.* at 91:8–11.) Durham, by his own telling, attempted to flee immediately upon seeing Detectives Molina and Lauture chase Wilson into an alleyway. (ECF No. 34 ¶ 4.) The Defendants argue Durham's "fourteen second[]" pause before fleeing to officers amounted to submission to their authority. (ECF No. 36 at 3.)[3] However, such "momentary pause or mere inaction" does not mean a suspect has submitted to the authority of the officers, particularly where the momentary pause was merely a tactical decision to help in evading the officers pursuing another suspect. *United States v. Waterman*, 569 F.3d 144, 146 (3d Cir. 2009).

The Court therefore agrees with the Government that Defendants were not seized until they were met with physical force. For Durham, this was when he was tripped by the officer and detained thereafter. (Gov't Ex. 4 0:25–0:45.)

        **3.     The officers possessed reasonable suspicion when they seized Defendants by bringing them under the Ooficer's physical control.**

---

[3] Defendants contest the exact amount of time Durham paused before fleeing from the police. (ECF No. 36 at 3 n.2.) There are different accounts which place Durham's pause between fourteen and twenty seconds after encountering the police. (*Id.*) However, the Court's analysis would remain the same, even if Durham paused for an additional six seconds.

Defendants were only seized when they came under the physical control of the detectives, and the question is whether the detectives had reasonable suspicion to seize Defendants at that moment. *United States v. Lowe*, 791 F.3d 424, 431 (3d Cir. 2015) (explaining the inquiry for the Fourth Amendment is whether "the facts known to the officers at that moment of seizure [gave] rise to reasonable suspicion"). To determine whether such reasonable suspicion existed, the Government and Defendants focus heavily on the case *Illinois v. Wardlow*, which held "headlong flight is the consummate act of evasion," and when it occurs in a "high-crime area," that can support the officer's reasonable suspicion of criminal activity. 528 U.S. 119, 124 (2000).

Here, there is no question Defendants engaged in immediate, headlong flight. Upon seeing the detectives, Wilson immediately moved into an alleyway before sprinting away from the police, discarding a firearm and attempting to scale a fence. (Gov't Ex. 3 0:30–1:30; *see also* ECF No. 46 at 32:9–33:14.) Durham made a momentary pause for at most twenty seconds to allow the officers chasing Wilson to pass before he began sprinting in a different direction. (ECF No. 34 at 4–5.) His flight thereafter was so reckless that when he was stopped by a detective, he tripped with such force it caused the firearm he concealed to fly free of his waistband and onto the road—in full view of the officers and their BWCs. (Gov't Ex. 4 0:25–0:45.) However, a "single act of flight [is] ambiguous" and does not on its own justify a seizure. *Wardlow*, 528 U.S. at 130 n.3 (Stevens, J., concurring).

Given that ambiguity, the prosecution and defense focus their dispute on whether Defendants were in a "high-crime area" at the time. (*Compare* ECF No. 48 at 14; *with* ECF No. 49 at 9–10.) Defendants believe the Court should determine Defendants were not in a high-crime area, based on a crime hot-spot map created by the Crime Center tracking shooting incidents and gun recoveries across Paterson. (Gov't. Ex. 1.) This map places the location Defendants were

seized outside any colored zone, as essentially no gun crimes had been recorded before Defendants had been arrested. (*Id.* at 1.) In response, the Government directs the Court to consider the testimony of the detectives and their understanding that the "intersection of Union Avenue and Jasper Street was a high-crime area." (ECF No. 49 at 10.)

Here the Court is faced with two credible, contradictory pieces of evidence as to whether Defendants were in a high-crime area at the time they were stopped. There is no set standard for what constitutes a high-crime area, and the credible testimony of law enforcement may serve as evidence that the suspects were in a high-crime area. *See, e.g.*, *United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) (highlighting that it is unsettled "whether under the flight 'plus' analysis of *Wardlow* . . . the government is required to prove the existence of objective criteria for what constitutes a high crime area and that the stop occurred in such an area") (Smith, J., concurring). The credible testimony of officers is valuable here because "an officer is in the position to know the routines and patterns of a geographic area, and whether it is more prone to crime. This knowledge may not be reflected on arrest records and log sheets, as arrests are not the only indicia of crime." *Id.* However, such testimony also poses a unique problem for the Court because it is self-justifying—the objective test for whether a seizure violated the Fourth Amendment cannot turn on an officer's subjective beliefs about the danger of an area which may "easily serve as a proxy for race or ethnicity," unless carefully examined by the Court. *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000). The danger in relying exclusively on law enforcement intuitions when determining whether an area is high-crime is well-documented. Ben Grunwald & Jeffrey Fagan, The End of Intuition-Based High-Crime Areas, 107 Cal. L. Rev. 345 (2019). Statistical analyses of cases where courts accepted "bare testimony that an area is high crime without additional proof," suggests that officers' testimony is "only weakly correlated with

19

actual crime rates," because officers may feel pressured to use an alleged "high crime area as cover to bolster the appearance of constitutional validity in their weakest stops." *Id.* at 396.

When Courts credit law enforcement testimony that designates "entire neighborhoods or communities," as high-crime it undermines the assumption in *Wardlow* that only high crime areas are geographically constrained. *Montero-Camargo*, 208 F.3d at 1138; *see also United States v. Wright*, 485 F.3d 45, 53–54 (1st Cir. 2007) (limiting a finding of a high-crime area to places where certain factors were met); *United States v. Weaver*, 9 F.4th 129, 156 (2d Cir. 2021) ("Blind acceptance of police testimony on [high-crime areas] creates an unjustified risk of arbitrary and discriminatory policing.") (Raymond, J., concurring). Excessively large high-crime areas risk lowering an entire populace's Fourth Amendment protections in ways not commensurate with the risk actually posed to citizens by crime.

To avoid this outcome, other Circuits have adopted three factors for Courts to consider in determining whether to credit a high-crime designation: (1) "the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case;" (2) "limited geographic boundaries of the area or neighborhood being evaluated;" and (3) "temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue." *See Wright*, 485 F.3d at 53–54; *see also United States v. Swain*, 324 F. App'x 219, 222 (4th Cir. 2009) (applying *Wright*); *United States v. Esquivel-Rios*, 725 F.3d 1231, 1239 (10th Cir. 2013) (same).

The Government points to the detailed testimony of Detective Lauture to support its position that the intersection of Union Avenue and Jasper Street (where El Fogón is located) is a high-crime location. (ECF No. 49 at 10.) Detective Lauture credibly testified he had been a part of a "long-term investigation" of a segment of the Bloods street gang who "resided at the time on

Jasper Street." (ECF No. 46 at 126:3–128:9.) As part of that investigation, he observed many crimes at that intersection specifically, namely "[a] lot of drugs, hand-to-hand transactions [occurred] on the corner of Jasper and Union." (*Id.* at 128:1–5.) Although drug transactions do not implicate the exact patterns of behavior associated with illegal possession of guns, both involve concealing contraband and involve the same types of suspicious behavior such as blading the body and obscuring an individual known to be carrying the illegal items. (*Id.* at 23:12–24:5, 82:4–8.) Therefore, there is a "nexus" between the patterns of criminal activity in the area and the suspicious behavior of the suspects. *Wright*, 485 F.3d at 53. The prosecution's position, and Detective Lauture's testimony, both support an alleged high-crime area of an appropriate scope which accurately ties the geography of the high-crime area to a "very specific location[], like an intersection where illegal deals are made," in order to accurately identify patterns of criminal behavior while "respect[ing] the liberty of people 'go[ing] about their daily business.'" *Weaver*, 9 F.4th at 157 (Lohier, J., concurring) (quoting *Montero-Camargo*, 208 F.3d at 1138). Unfortunately, Detective Lauture's testimony provides no time frame for when he observed this criminal activity. (ECF No. 46 at 126:3–128:15.) At best, the Court can surmise this observation occurred sometime within the six years Detective Lauture had been part of the New Jersey Division of Criminal Justice. (ECF No. 46 at 11.)[4]

---

[4] Defendants argue that the Court should not credit the testimony of Detective Molina on this issue of whether Durham was seized in a high crime area, citing his expansive view of the scope of such an area. (ECF No. 48 at 9–10.) Although the Government adopts the more limited scope of the alleged high-crime area advanced by Detective Lauture, it requests the Court consider Detective Molina's testimony as supporting evidence. (ECF No. 49 at 10–11.) Applying the *Wright* factors, 485 F.3d at 53–54, the Court finds Detective Molina's testimony does not have sufficient nexus to this crime, and is not appropriately cabined to a specific geographic area. The Court, therefore, will only consider Detective Lauture's testimony and the Crime Center map when determining whether Durham fled in a high-crime area.

This contrasts with the Crime Center hotspot map proffered by Defendants; a third-party analysis of the shooting incidents and other gun crimes committed within the city of Paterson, which shows that no relevant crimes occurred on that corner in the previous year. (Gov't Ex. 1.) This hotspot map has a clear nexus to the crime at hand, as it tracks gun crime and recoveries specifically. (*Id.* at 1.) Similar to Detective Lauture's testimony, it also localizes the crime to specific streets and intersections rather than declaring entire cities or neighborhoods high-crime. (*Compare id.*, *with* ECF No. 46 at 126:3–128:15.) Although it does not flatly contradict Detective Lauture's analysis, as they address different kinds of crime, it may suggest the nature of the neighborhood has changed since the Detective investigated it previously, because the hotspot map tracks relevant crimes that occurred in the year prior to Defendants' arrest and therefore speaks to the same temporal period. (Gov't Ex. 1; *see also* ECF No. 46 at 195:22–196:1.) In light of these two credible, albeit inconsistent, pieces of evidence, the Court does not find Defendants were located in a high-crime area at the time they were seized.

Nevertheless, the Court finds neither Defendants' Fourth Amendment rights were violated when considering the totality of the circumstances. When suspects flee the police, no seizure has occurred, and therefore there is no basis to suppress any evidence gathered during the pursuit. *Hodari D.*, 499 U.S. at 625 (holding there was no basis to suppress cocaine "discarded" while the suspect was pursued by the police). Furthermore, "if the seizure occurred after suspicious behavior such as flight, this factors into [the court's] analysis of whether there was reasonable suspicion to justify the seizure." *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009). For this reason, there can be no basis to suppress Wilson's firearm from evidence because it was discovered when he attempted to discard it while fleeing the Detectives.

There is more ambiguity as to whether Durham's weapon was similarly discarded or lost during his pursuit as it was lost specifically when Durham was tripped by an officer—the act which brought him under the control of the police. Under *Torres v. Madrid*, any "use of force *with intent to restrain*," is a seizure, even when the suspect is not brought under the full control of the police. 592 U.S. 306, 317 (2021) (emphasis in original). Unlike the suspect in *Hodari D.* and his co-defendant, Durham did not voluntarily discard the gun during the pursuit. 499 U.S. at 625. Therefore, even if the officer was not intending to collect evidence when he tripped Durham, that act affected a seizure and the Court must suppress the gun if the seizure itself was unlawful. *United States v. Perkins*, 871 F. Supp. 801, 803 (M.D. Pa. 1995), *aff'd*, 91 F.3d 127 (3d Cir. 1996) ("Abandonment must be voluntary in fact; it is not voluntary if it is the result of a preceding Fourth Amendment violation or other illegal police conduct"); *see also United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993) ("[A]n abandonment is not voluntary when it results from a Fourth Amendment violation.").

Even so, there is no question that the officer's seizure of Durham was supported by reasonable suspicion. At the time the officers seized Durham, they had observed: (1) Durham congregate outside a liquor store near midnight with a group of other men (ECF No. 46 at 125:17–126:2); (2) Durham move to shield one of the other men from the view of the police (*id.* at 141:6–24); (3) Wilson, the man Durham attempted to shield, flee into an alley as officers approached (*id.* at 82:4–85:4); (4) Durham himself break into a headlong flight within seconds of seeing the officers exit their vehicles (Gov't Ex. 4 at 0:00–0:45); (5) Durham clutch an object around his waist as he ran (*id.*); and (6) Wilson discard a weapon during the course of his pursuit (Gov't Ex. 3 at 0:30–1:30; *see also* ECF No. 46 at 32:9–33:14); *see, e.g.*, *United States v. Goodrich,* 450 F.3d 552, 561 (3d Cir. 2006) (finding "the lateness of the hour . . . supports the inference of criminal

23

activity" alongside other factors); *see also Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs . . . is certainly suggestive of [wrongdoing]."); *United States v. Samuels*, 131 F. App'x 859, 862–863 (3d Cir. 2005) (holding officers had reasonable suspicion for a seizure where suspect was grabbing a visible bulge at their waist); *United States v. Gonzalez*, 630 F. App'x. 157, 161 (3d Cir. 2015) ("The collective knowledge doctrine allows imputation of one law enforcement officer's knowledge to another officer.").

For the foregoing reasons, the Court finds Defendants were not seized until they were physically apprehended by law enforcement. Further, the Court finds the firearms recovered after Defendants were seized may not be suppressed because Wilson's firearm was voluntarily discarded during the pursuit, and the seizure of both Defendants was justified by reasonable suspicion. Therefore, neither firearm will be suppressed.

### B.    Violations of the BWC Policy do not Warrant Suppression of Validly Obtained Evidence.

Defendants also argue, apart from their Fourth Amendment Arguments, the guns found on their person should be suppressed as evidence because the officers did not activate their BWCs when initially engaging Defendants. (ECF No. 48 at 9–10.) However, the Supreme Court is clear that in federal criminal cases, federal law alone determines whether evidence should be suppressed. *See, e.g.*, *Elkins v. United States*, 364 U.S. 206, 224 (1960) ("In determining whether there has been an unreasonable search and seizure by state officers . . . [t]he test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."); *see also Virginia v. Moore*, 553 U.S. 164, 174 (2008) ("A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones

24

unreasonable, and hence unconstitutional."). Furthermore, even were the Court to apply New Jersey law for law enforcement conduct, the Attorney General's guidance document would not be the right reference point. Instead, the Court would look to New Jersey's BWC statute, which defines both when law enforcement officers are to employ their BWCs, and the consequences for failing to do so. N.J. Stat. Ann. § 40A:14-118.5 (New Jersey Body Worn Camera Statute). Here, the statute does not permit the suppression of otherwise validly obtained evidence. Instead, it provides a "rebuttable presumption that exculpatory evidence was destroyed or not captured in favor of a criminal defendant." *Id.* § 40A:14-118.5q (2); *see also State v. Seligman*, 329 A.3d 1090, 1099 (N.J. Super. Ct. App. Div. 2025) (holding "nothing in the text of the statute . . . warrants automatic suppression of evidence otherwise lawfully seized"). Because the state is imposing a greater degree of protection on Defendants than contemplated by the Fourth Amendment regarding BWCs, the Court cannot apply those standards when deciding whether to suppress evidence pursuant to the Fourth Amendment alone.

The Government argues the officers' decision not to activate their BWCs when they initially engaged Defendants should instead be read as proof the officers had not seized Defendants at the time. (ECF No. 49 at 3–4.) Essentially, according to the Government, because "[p]olice officers are . . . required to activate their cameras when conducting an investigative seizure," the fact that they didn't "supports the inference that Durham was not subject to seizure." (*Id.* at 4.) This argument would make the officers the legal arbiter of when suspects were seized, contradicting the well-established principle that, "[a] seizure occurs for Fourth Amendment purposes when a reasonable person would have believed that he was not free to leave." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 147 (3d Cir. 2005) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). It is the suspect's reasonable perceptions that determine

25

when they have been seized, not the subjective intent of the officers. Therefore, the Court considers the timing of when the officers activated their BWCs irrelevant to whether the later-acquired guns should be suppressed.

### C.    The Government's Claim Durham Lied in His Certification Is Without Foundation.

Alongside Defendants' Motion to Suppress, Durham included a certification of the facts as he now understands them. (*See* ECF No. 34-2.) Durham's certification is consistent with all the facts and extrinsic evidence available to the Court. (*See id.*) Nevertheless, the Government argues Durham has affirmatively lied to the Court by providing a perspective which differs from "Det. Lauture's credible testimony." (ECF No. 49 at 5.) To support this contention, the Government provides three "exaggerations" Durham supposedly made, including that he and Wilson were approached by a police convoy consisting of "approximately 14 law enforcement personnel, in approximately five unmarked cars," that the officers used their vehicles to "block[] the egress from the parking lot," and that seeing the police "follow[] and apprehend[]" Wilson as he tried to leave caused Durham to believe he too was being detained. (*Id.* at 6.) However, each of these claims is "accurate," as the Government itself concedes. (*Id.*) The Court will not decide that a witness is lying based on his inclusion of factually accurate information in his certification. (*Id.*) It is unclear what relief the government seeks in making this request. (*Id.* at 5.) The Court has considered Durham's certification and found that it was outweighed by other evidence. *See* Part III.A.1, *supra*.

## IV.    CONCLUSION

For the reasons set forth above, Durham's Motion to Suppress (ECF No. 34) is **DENIED**. An appropriate order follows.

**Date: June 12th, 2026**

*s/ Brian R. Martinotti*

**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**